IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| EDWARD KIRBY,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL HOOPES, individually and in his official capacity as an officer for the Des Moines Police Department; BRYAN LOFTUS, individually and in his official capacity as an officer for the Des Moines Police Department; and THE CITY OF DES MOINES, IOWA,<br><br>Defendants. | No. 4:25-cv-00336-SHL-SBJ<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

When Plaintiff Edward Kirby asked law enforcement officers how much the bond would be for someone he believed they were arresting, one of the officers responded by putting Kirby into handcuffs. Kirby alleges that this violated his Fourth Amendment rights and constituted false arrest and "trespass to the person" under Iowa law. Defendants move for summary judgment, arguing, among other things, that they had lawful grounds for detaining Kirby for the crime of interference with official acts. (ECF 12.) For reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment. Kirby's claims under 42 U.S.C. § 1983 and for false arrest will proceed to trial as against Defendant Michael Hoopes, as will his respondeat superior claim against the City of Des Moines on the false arrest theory. His other claims will be dismissed, including all claims asserted against Defendant Bryan Loftus.

## I. FACTUAL BACKGROUND.

On a motion for summary judgment, the Court resolves all disputed facts and draws all reasonable inferences in favor of the plaintiff as the non-moving party. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998). However, when parties purport to "dispute" facts that are captured on body-worn cameras ("BWC") from police officers, the Court is entitled to rely on the video footage to determine whether the dispute is genuine. *See Brown v. City of St. Louis*, 40 F.4th 895, 899 (8th Cir. 2022) (citing *Steed v. Mo. State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021) (recognizing that courts may use video footage when ruling on a summary judgment

motion where "opposing parties tell two different stories, one of which is blatantly contradicted by the record"). Accordingly, this background section will often cite directly to video footage.

At 3:06 pm on August 17, 2023, Officers Hoopes and Loftus were working a shift as a two-man unit when they stopped for a break at the QuikTrip ("QT") convenience store on University Avenue and Sixth Avenue in Des Moines, Iowa. (ECF 17-3, ¶¶ 1–2.) Upon entering the QT, the clerk told them that someone had stolen merchandise and pointed out the alleged thief, Avery Dibble, across the street at McDonald's. (Id., ¶¶ 4–5.) Hoopes walked across University Avenue to talk to Dibble while Loftus drove the marked police car around. (Id., ¶¶ 6, 8.) Unbeknownst to the officers at this time, Kirby had witnessed Dibble taking items from the QT. (ECF 19-2, ¶ 2.) Kirby recognized Dibble from the neighborhood, knew that he was unhoused, and decided to pay for the items himself. (Id., ¶¶ 1–2.)

In front of the McDonald's, Hoopes told Dibble to stand up and put his hands behind his back, and Dibble complied. (ECF 17-3, ¶ 7.) While Hoopes was handcuffing Dibble, Loftus reached the parking lot in the police vehicle. (Loftus BWC,[1] 2:00–2:03.) As Hoopes began leading Dibble towards the police vehicle, Kirby walked to the median of University Avenue to tell the officers that he had paid for Dibble's chips. (Id., 2:21–2:25; ECF 17-3, ¶ 11.) In response, Loftus said, "Ok…that's legit then" and Hoopes said, "Ok, that's fine, that's cool, thank you." (Loftus BWC, 2:25–2:31.)

Hoopes continued leading Dibble to the police vehicle and read him his *Miranda* rights. (Id., 2:32–3:19; ECF 17-3, ¶ 12–13.) Dibble affirmed that he understood his rights and said he did not wish to speak to the officers. (Loftus BWC, 3:14–3:25; ECF 17-3, ¶ 14.) Hoopes then placed Dibble in the back of the patrol car and began to look through his belongings while Loftus went back to the QT to talk to Kirby and see if he bought anything else for Dibble. (Hoopes BWC,[2] 3:10–6:30; Loftus BWC, 3:24–4:27; ECF 17-3, ¶ 36.)

In the QT parking lot, Kirby told Loftus, "Whatever it is he took, I'll pay for it." (Loftus BWC, 4:25–4:31.) Kirby had already bought Dibble's chips by that point, but Loftus said Dibble had taken "more than that," though he did not know exactly what. (Id., 4:31–4:42.) Loftus also told Kirby that Dibble had trespassed and said he "can't be on the property regardless," to which Kirby replied, "Y'all gonna spend more [on] gas taking him to jail for trespassing than anything."

[1] "Loftus BWC" refers to Loftus' body-worn camera footage, found in the record at ECF 16, p. 122.
[2] "Hoopes BWC" refers to Hoopes' body-worn camera footage, found in the record at ECF 16, p. 122.

(Id., 4:42–4:50.) Loftus said they had to hold Dibble accountable but could cite him instead of taking him to jail. (Id., 4:50–4:56; ECF 17-3, ¶ 21.) Kirby responded with something along the lines of "so why not just cite him," to which Loftus indicated it was an "option." (Loftus BWC, 4:55–4:58; ECF 17-3, ¶ 22.) Kirby replied, "We all know how them 'options' work." (Loftus BWC, 4:59–5:02.)

Kirby and Loftus then re-entered the QT, where Kirby attempted to figure out what else Dibble had taken so he could pay for it. (ECF 17-3, ¶ 23; Loftus BWC, 4:59–5:15.) Kirby explained to the QT worker that "I just don't want [them] to get him on a theft charge," but Loftus said, "He's still going to jail if he's trespassed." (ECF 17-3, ¶ 24; Loftus BWC, 5:11–5:17.) As it turned out, QT was only interested in pursuing the trespass, not the theft. (Loftus BWC, 5:27–5:37; ECF 17-3, ¶¶ 27–28.) The clerk then provided Dibble's name, which Loftus thought was familiar from an earlier, similar trespassing incident. (Loftus BWC, 5:39–5:44; ECF 17-3, ¶ 29–31.)

Loftus walked back across the street towards Hoopes and Dibble in the McDonald's parking lot, passing Kirby in the QT parking lot along the way. (Loftus BWC, 6:00–6:48; ECF 17-3, ¶ 35.) When Loftus arrived at the McDonald's, he said, "Alright, that guy has got to stop." (Loftus BWC, 6:50–6:52; ECF 19-2, ¶ 4.) Defendants suggest that Loftus was talking about Dibble, but a reasonable juror could conclude he was referring to Kirby. (Loftus BWC, 6:50–6:52; ECF 19-2, ¶ 4.) Regardless, Loftus did not dwell on it and instead began explaining to Dibble and Hoopes that QT was focused on the trespass, not the theft. (Loftus BWC, 6:52–6:58; ECF 19-2, ¶ 4; ECF 17-2, ¶ 37.) Loftus said he remembered seeing Dibble trespassing at the QT before but was unsure if he prepared the corresponding report. (Loftus BWC, 7:03–7:08.)

Hoopes and Loftus then got into the police vehicle and began searching the computer system to see if Dibble had a prior trespass notice. (ECF 17-2, ¶¶ 39–40; Loftus BWC, 7:11–8:30.) If so, he could be charged for having returned to the property. (ECF 17-2, ¶ 42.) After roughly a ninety second computer search, Hoopes said, "Well I don't think he's trespassed because I spelled his name and everything correctly, and there's nothing coming up." (Loftus BWC, 8:30–8:37; ECF 19-2, ¶ 7.) Loftus insisted, "There's something in there dude," and asked Dibble to verify his name and birthdate. (Loftus BWC, 8:37–8:49; Loftus In-Car Cam, 8:22–8:29; ECF 17-3, ¶ 44.) Dibble denied ever being told to stay off QT property. (Loftus BWC, 8:49–8:56; Loftus In-Car Cam, 8:29–8:32; ECF 19-2, ¶ 6.) After some back-and-forth where Loftus again expressed certainty that Dibble had been trespassed before, Loftus took over the computer search and re-entered Dibble's

birthdate into the search bar. (Loftus BWC, 9:15–10:00; ECF 17-3, ¶ 47.) He did not answer Hoopes when asked how he was "going to search it any differently." (Loftus BWC, 9:38–9:42; ECF 17-3, ¶ 48.)

After Loftus had searched for approximately thirty seconds, Hoopes said, "We're just going to do an advisal." (Loftus BWC, 10:20–10:25; ECF 17-2, ¶ 48.) Loftus agreed. (Id.) Hoopes then asked Dibble if he had ever been issued an Iowa ID. (Loftus BWC, 10:27–10:32.) Initially, Defendants suggested that Hoopes was "looking for another way to see if Dibble had previously received a trespass notice, likely on NCIC." (ECF 12-2, ¶ 49.) Later, Defendants admitted that an NCIC search would not provide information related to trespass. (ECF 19-2, ¶ 10.)

Just then, Kirby pulled into the McDonald's parking lot in his own vehicle and drove near the patrol car to ask, "How much is his bond?" (ECF 17-3, ¶ 51; Loftus BWC, 10:43–10:46.) Loftus turned briefly towards Kirby, told him to "Go away," and waved him off. (Loftus BWC, 10:44–10:46; Hoopes BWC, 10:25–10:27; ECF 17-3, ¶ 60.) Kirby replied, "I don't gotta go nowhere." (Loftus BWC, 10:47–48.) Hoopes said, "Ok," exited the police vehicle, and headed towards Kirby. (Loftus BWC, 10:48–10:51; Hoopes BWC, 10:29–10:33; ECF 17-3, ¶ 62.) Loftus did not leave the patrol car, instead remaining in the driver's seat typing on the computer. (Loftus BWC, 10:46–11:26; ECF 19-2, ¶¶ 13–14.) Defendants argue that Loftus was continuing the Dibble investigation while also keeping his eye on the Hoopes/Kirby interaction. (ECF 12-2, ¶ 76; ECF 19-2, ¶14–15.) Kirby argues that (i) the Dibble investigation was over because officers had already decided to do an advisal, and (ii) Loftus was not concerned about Kirby. (ECF 17-3, ¶ 76; ECF 19-2, ¶ 15.) Loftus later testified that he had safety concerns about Kirby's presence, but Kirby asserts that Loftus was able to "complete[] his typing and the release of Mr. Dibble without difficulty." (ECF 19-2, ¶ 18; ECF 16, p. 47.)

As Hoopes approached Kirby, he pulled his handcuffs out. (Loftus Dash Cam, 10:29–10:34; ECF 17-3, ¶ 63.) Kirby was sitting in his car when Officer Hoopes began walking towards him but exited the vehicle as Hoopes reached it, moving away from Hoopes while doing so. (Hoopes BWC, 10:32–10:36.) The parties dispute whether Kirby was still in his car when Hoopes got his handcuffs out. (ECF 17-3, ¶ 63.) They also dispute *why* Hoopes got the handcuffs out. Kirby argues that Hoopes was simply frustrated and annoyed, (ECF 17-3, ¶ 62), whereas Hoopes says it was "more of a heightened situation because I didn't know what Mr. Kirby's intentions were based on his vehicle's position." (ECF 19-2, ¶ 11). Based on the video, a reasonable juror

could conclude that Hoopes left the police vehicle because he was annoyed, not because he perceived a threat. (Hoopes BWC, 10:29–10:33; Loftus BWC, 10:48–10:53.) A reasonable juror likewise could conclude that Loftus was not threatened, either.

The positioning of Kirby's car is a central dispute between the parties. The police vehicle was parked diagonally across two parking spots in the McDonald's parking lot, mostly facing University Avenue. (Loftus Dash Cam, 1:24–1:35; Hoopes BWC, 10:29–10:33.) Because of how the police car was parked and the orientation of the parking lot, there was no way for Kirby to approach the officers from the front. (ECF 17-3, ¶ 51.) Doing so would have required him to jump a curb and drive over a strip of grass. Kirby therefore pulled his car up "at an angle near the rear driver's side of the patrol vehicle," bringing his car to a stop in a location that was essentially parallel to the police vehicle and more to the side than behind. (Id.; ECF 12-2, ¶ 54; Hoopes BWC, 10:29–10:33.) Loftus said the two cars were approximately ten to twelve feet apart, which he describes as "pretty close." (ECF 17-3, ¶ 52.) But Hoopes had to cross through an empty parking spot diagonally to get to Kirby's vehicle, thus showing that Kirby left a fair amount of distance between the two cars. (Hoopes BWC, 10:29–10:33.) To that end, the video shows that Kirby did not block the police vehicle, but rather left plenty of room for the police vehicle to maneuver around Kirby's car in at least two different directions. (Id.) Regardless, Defendants say Kirby positioned his car in a way that gave him a "tactical advantage" in the sense that "Loftus had to turn his head to see Kirby." (ECF 12-2, ¶¶ 55–57.) For his part, Kirby says, "only a slight turn…was needed." (ECF 17-3, ¶ 57; Hoopes BWC, 10:25–10:28.) The video supports Kirby's position. (Hoopes BWC, 10:25–10:27.)

When Hoopes reached Kirby's car, he immediately told Kirby to put his hands behind his back. (Id., 10:36–10:38.) Kirby complied, was handcuffed, and asked if he was being detained—to which Officer Hoopes replied, "Yes, for interference." (Id., 10:36–10:45; ECF 17-3, ¶¶ 64–66.) Kirby said, "You don't have to be so rough. I just asked what bond was… you don't have to do all that." (Hoopes BWC, 10:42–10:47.) Hoopes repeated that he was detaining Kirby for interference, pointing out that Loftus told Kirby to "go away" while officers finished an investigation that did not pertain to Kirby. (Id., 10:47–10:53.) At that point, a bystander pulled up to compliment Kirby's vehicle. (Id., 10:54–10:56.) Kirby and Hoopes began speaking over one another to the woman, with Kirby telling her he was being detained for asking about Dibble's bond and Hoopes telling

her to back up because the officers were detaining Kirby and doing an investigation. (Id., 10:56–11:06.)

As Kirby was walking towards the patrol car, Hoopes put his hand on Kirby's torso and said, "We can chill right here." (ECF 17-3, ¶¶ 69–70.) Kirby said, "Stop touching me man." (Hoopes BWC, 11:07–11:09.) Loftus then got out of the police vehicle, came over, and told Kirby, "We weren't even arresting [Dibble]." (Loftus BWC, 11:29–11:32; ECF 17-3, ¶ 77.) Kirby reiterated that he was just asking how much bond was because Loftus previously said Dibble was going to jail. (Loftus BWC, 11:32–11:35.) Kirby became agitated and said he didn't understand why the officers were getting so aggressive. (Hoopes BWC, 11:18–11:22.) Hoopes replied, "Do you want to go to jail though? Because that's the way you're going…I'm trying to work with you…" (Id., 11:18–11:22.)

Loftus then walked back to the patrol car to uncuff and release Dibble. (Loftus BWC, 11:35–11:47; ECF 17-3, 78.) Loftus returned Dibble's belongings, told him he was not allowed on QT property in the future, and told him he was free to go. (Loftus BWC, 11:40–12:50.)

Meanwhile, Kirby kept repeating that he was just asking about bond and did not know what he did wrong before "quiet[ing] down enough for Hoopes to explain that [QT] just wanted Dibble trespassed so there would be no jail and no bond." (ECF 17-3, ¶ 73; Hoopes BWC, 11:22–11:45.) Hoopes said the problem was that Loftus had asked Kirby to go away, but Kirby refused. (Hoopes BWC, 11:43–11:46.) Kirby defended himself by arguing that the first time Loftus told him to go away was when Kirby approached to ask about Dibble's bond. (Id., 11:46–11:53.) After a bit of back-and-forth, Hoopes again said the Dibble investigation did not pertain to Kirby, who replied, "That could be my brother for all you know." (Id., 11:52–12:02.) Hoopes said, "Ok then, he can call you from jail if that's the route it's gonna go." (Id., 12:02–12:05.) Hoopes then clarified about twenty seconds later that "[Dibble]'s not going to jail, he's being advised of trespass, [and] he just can't go to this QT anymore." (Id., 12:24–12:30.)

Loftus then circled back around the patrol car as Kirby asked, "Am I going to jail or not?" (Id., 12:35–12:37; Loftus BWC, 12:55–12:59.) Loftus said, "No," and Hoopes began removing Kirby's handcuffs. (Loftus BWC, 12:55–12:59.) While uncuffing him, Hoopes told Kirby that "If an officer tells you to back up, you need to back up." (Id., 13:00–13:04.) Kirby repeatedly insisted that he "wasn't even by [them]" and was in a public parking lot. (Id., 13:04–13:15.) When the handcuffs were removed, Officer Loftus said, "You're good to go man," and the parties left in their

respective vehicles. (Id., 13:15–13:42.) In total, Kirby was detained for approximately two minutes and twenty seconds.[3] (Hoopes BWC, 10:36–12:57.)

## II. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of identifying "the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). Once met, the burden shifts to the nonmoving party to respond with evidentiary materials "showing the presence of a genuine issue for trial," such that "a jury could reasonably find in his favor." *Id*. at 997 (citing *Torgerson*, 643 F.3d at 1042 and *Gibson v. Am. Greetings Corp*., 670 F.3d 844, 853 (8th Cir. 2012)). Doing so requires the nonmovant to show more than "some metaphysical doubt as to the material facts." *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986)). The Court may consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," in considering if each party met its burden. *Church v. Anderson*, 249 F. Supp. 3d 963, 969 (N.D. Iowa 2017) (citing Fed. R. Civ. P. 56(c)), *aff'd*, 898 F.3d 830 (8th Cir. 2018). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Gray v. FedEx Ground Package Sys., Inc*., 799 F.3d 995, 999 (8th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*.,

[3] Due to what appears to have been an inadvertent mistake, there was a mismatch between Defendants' Statement of Undisputed Facts and Plaintiff's Response of Statement of Undisputed Facts as to Paragraphs 84 through 87. (ECF 17-3, ¶¶ 83–86.)) Based on context, it seems clear that Kirby accidentally skipped Paragraph 84 (which he intended to admit) and meant to deny Paragraphs 85 through 87 as to the length of his detention and presence of probable cause. Because the bodycam footage definitively shows the length of Kirby's detention, the Court will rely on it in lieu of parties' respective Statements of Undisputed Facts. Relatedly, the Court attaches no significance to Kirby's technical failure to reply to Paragraphs 86 and 87 because these Paragraphs simply summarize information from other Paragraphs that Kirby addressed and disputed. (ECF 12-2, ¶¶ 86–87.)

530 U.S. 133, 150 (2000)). "Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, there is a genuine issue for trial." *Id*. (citing *Torgerson*, 643 F.3d at 1042).

## III. LEGAL ANALYSIS.

### *A. Kirby's Trespass to the Person Claim Will Be Dismissed Because It Is Not a Freestanding Theory of Recovery Under Iowa Law.*

As a threshold matter, the Court will address Kirby's putative state law claim for "trespass to the person." Although pled as a standalone theory of recovery, Kirby has not cited—and the Court cannot independently locate—any Iowa Supreme Court cases since 1873 that have used this label to describe a freestanding cause of action. (ECF 17-1, pp. 17–19 (citing *Nord v. Burlington & M.R.R. Co.*, 37 Iowa 498, 499 (1873); *Parmlee v. Leonard*, 9 Iowa 131, 136 (Iowa 1859); *Barnes v. Davis*, 2 Iowa 160 (1855).) After reviewing these 19th century cases, and more recent developments in the law, it is clear that "trespass to the person" is now at most simply an umbrella term for common law tort causes of action like false arrest, false imprisonment, battery, and/or assault. *See, e.g.*, Restatement (Second) of Torts, § 907 (1979) (differentiating "actions for trespass to the person" from actions for "trespass to land"). Accordingly, the Court will dismiss Kirby's "trespass to the person" claim as redundant to his false arrest claim.

Kirby himself recognized the overlap between his "trespass to the person" and false arrest claims when he cited a recent dissent from Iowa Supreme Court Justice Matthew McDermott in *Sikora v. State* for the proposition that trespass to the person "is a variation of trespass *vi et armis*…[which] served as 'the foundation for torts such as assault, battery, and false imprisonment.'" (ECF 17-1, p. 18 (quoting *Sikora v. State*, 23 N.W.3d 300, 347 (Iowa 2025) (McDermott, J., dissenting) (quoting F.W. Maitland, *Equity Also the Forms of Action at Common Law: Two Courses of Lectures* 383 (A.H. Chaytor & W.J. Whittaker eds., 1910))).) Kirby apparently interprets Justice McDermott's dissent to mean that "trespass to the person" retains some level of viability as a standalone cause of action. This is not, however, the point that Justice McDermott was making. The cause of action in *Sikora* was for false imprisonment, and Justice McDermott was simply pointing out there has been an evolution in the terminology used for such causes of action since the 19th century. *See id.* (explaining that the "historical forms of trespass referred to as trespass 'on the case' and trespass '*vi et armis*' … [are] sparingly referred to by these names in courts today"). In other words, Justice McDermott was recognizing that "trespass to the person" is an antiquated phrase that has now been replaced by more specific terms like "false

arrest" or "false imprisonment." Because Kirby has raised a false arrest claim here, his "trespass on the person" claim serves no independent purpose.

Kirby's citation to an Iowa Supreme Court case from 1968, *Van Camp v. McAfoos*, is likewise unavailing. In *Van Camp*, the Iowa Supreme Court said: "Plaintiff cite[d] many cases from other jurisdictions holding a child of tender years may be liable…for…trespass to the person." 156 N.W.2d 878, 881 (Iowa 1968). In context, *Van Camp* was simply using "trespass to the person" as an umbrella term to describe causes of action arising out of injuries to the person. The glancing use of this term does not mean that "trespass to the person" is a viable cause of action on its own. Thus, the Court GRANTS summary judgment as to all Defendants on Kirby's state law claim for trespass on the person.

*B. Loftus and the City of Des Moines Are Entitled to Summary Judgment on Kirby's Section 1983 Claims, but Hoopes Is Not.*

The Court now turns to Kirby's § 1983 claims. For reasons explained below, the Court concludes that Loftus and the City of Des Moines are entitled to summary judgment on those claims, but Hoopes is not.

1. <u>Legal Background: Qualified Immunity</u>.

Section 1983 imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Government officials are protected against section 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Qualified immunity 'is an immunity from suit rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (emphasis omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

Law enforcement officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). Moreover, all disputed facts must be interpreted in the plaintiff's favor when defendants move for summary judgment based on qualified immunity. *Tolan*, 572 U.S. at 657.

In assessing whether a right is clearly established, "[t]he relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)). This means a plaintiff must "identify controlling authority or 'a robust consensus of cases of persuasive authority' placing the constitutional question beyond debate." *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

2. <u>Loftus Is Entitled to Qualified Immunity on Kirby's § 1983 Claim.</u>

Liability under § 1983 is "personal." To prevail, "a plaintiff must show each individual defendant's personal involvement in the alleged violation." *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017); *See Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."). Mere presence at the scene of a violation is not enough. *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006). If "multiple officers are named in an action, the district court must review each officer's actions separately." *Dukeman v. Ste Genevieve County*, 167 F.4th 500, 504 (8th Cir. 2026).

Here, Loftus had no meaningful personal involvement in Kirby's arrest. The video shows that Hoopes unilaterally made the decision to leave the police vehicle, walk over to Kirby's vehicle, and place Kirby into handcuffs. Loftus remained sitting in his car on his computer the whole time.

Indeed, even when Kirby initially pulled up near the officers, Loftus barely glanced in his direction, simply saying "go away" while continuing to type. (Loftus BWC, 10:44–11:26.) Thus, as to Loftus, Kirby has proven nothing more than physical presence at the scene. *See Pitts v. City of Cuba*, 910 F.Supp.2d 1161, 1169 (E.D. Mo. 2012) (granting qualified immunity to officer who "was not the arresting officer, nor did he search or seize anything."); *Alford v. Deffendoll*, 165 F.4th 490, 496 (6th Cir. 2026) ("[A]cting as 'mere backup' to the arresting officer does not constitute personal involvement . . . [i]nstead there must be a 'causal connection between the officer's actions and the alleged constitutional violation'").

Granted, many courts of appeal outside the Eighth Circuit have recognized that an officer has a duty to intervene if another officer is violating someone's constitutional rights. *See Goyette v. City of Minneapolis*, No. 20-CV-1302, 2023 WL 6279370, at *7 (D. Minn. Sept. 26, 2023) (listing cases). However, the Eighth Circuit has not yet recognized such a duty except in the context of excessive force. *See Livers v. Schneck*, 700 F.3d 340, 360 (8th Cir. 2012) (granting qualified immunity to officer accused of failing to intervene outside the excessive force context because "such a duty was not clearly established…[w]here, as here, federal circuits disagree on whether conduct violates the Constitution, and [the Eighth Circuit] has not addressed the question."). This is reason alone to conclude that Kirby's § 1983 claim against Loftus fails.

Even if a duty to intervene exists in the Eighth Circuit in circumstances like those presented here, the record shows that Kirby was released from handcuffs within approximately ninety seconds of Loftus exiting the police vehicle and approaching him. (Loftus BWC, 11:30–13:15.) In the meantime, Loftus's only interaction with Kirby was to tell him that officers "weren't even arresting [Dibble]," (Loftus BWC, 11:29–11:32), and that he was not going to jail and was free to go. (Id., 12:55–13:17.) In these circumstances, Loftus essentially *did* intervene by taking prompt steps to secure Kirby's release after Hoopes had placed him into handcuffs. Thus, Kirby's § 1983 claim against Loftus would only be viable if he could cite clearly established law requiring Loftus to act more quickly than he did. Kirby has cited no such cases, nor is the Court aware of any. Loftus is therefore entitled to qualified immunity.

3. <u>Hoopes Is Not Entitled to Qualified Immunity on Kirby's § 1983 Claim.</u>

In contrast to Loftus, Hoopes personally placed Kirby into handcuffs, and thus the qualified immunity analysis revolves around whether he had some lawful basis for doing so. The analysis starts with determining the governing standard. Hoopes characterizes his interaction with Kirby as

a *Terry* stop for which only "reasonable suspicion" was required. (ECF 12-1, p. 8.) The Court is skeptical that this is the governing standard, as Hoopes did not conduct a pat-down search or take any other steps to suggest that he was detaining Kirby for "investigative purposes." *See, e.g.*, *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (describing the purpose of a *Terry* stop). Indeed, there was nothing for Hoopes to "investigate" in a situation where the alleged crime at issue was interference with official acts. This crime requires the suspect to have "knowingly resist[ed] or obstruct[ed]" an officer's performance of official acts, Iowa Code § 719.1(1), and thus by its very nature can only be committed through acts that officers personally witness. After all, officers generally cannot be "resist[ed]" or "obstruct[ed]" by acts outside their presence. Accordingly, Hoopes cannot reasonably claim to have handcuffed Kirby for investigative purposes. It follows that the arguable probably cause standard likely should apply. *See Hunt v. Acosta*, 109 F.4th 1003, 1008–1009 (8th Cir. 2024) (applying arguable probable cause standard where plaintiff was arrested for interference with official acts of tax county employees for "divert[ing] their focus" and causing a distraction); *Small v. McCrystal*, 708 F.3d 997, 1004–1005 (8th Cir. 2013) (applying arguable probable cause standard to assess the lawfulness of an arrest for interference with official acts).

All the same, the Eighth Circuit has applied the reasonable suspicion standard in at least some circumstances involving the temporary detention of "suspicious" bystanders. *See Chestnut v. Wallace*, 947 F.3d 1085, 1087–1088 (8th Cir. 2020). Thus, in an abundance of caution, the Court will apply the reasonable suspicion standard here. The result would be the same either way.

Hoopes asserts that he had arguable reasonable suspicion to believe that Kirby "knowingly resist[ed] or obstruct[ed]" official acts in violation of Iowa Code § 719.1(1) based on the totality of the circumstances, including Kirby: (i) illegally crossing University Avenue to yell at officers that he had paid for the chips Dibble allegedly stole; (ii) driving his vehicle from the QT parking lot to the McDonald's parking lot where officers had Dibble in the police vehicle; (iii) pulling up "at an angle and behind the patrol car, placing him in a blind spot" that created safety concerns and required Hoopes to leave the patrol car; (iv) saying, "I don't have to go anywhere" when Loftus told him to "go away"; (v) exiting his vehicle when Hoopes approached; and (vi) being agitated and using a raised voice during the interaction with Hoopes. (ECF 12-1, pp. 9–10.)

Typically, courts should not engage in a "divide-and-conquer analysis" in which they isolate individual facts for scrutiny rather than analyzing the totality of the circumstances. *See*

*Carter v. Lundwick*, 139 F.4th 982, 991 (8th Cir. 2025). Here, however, the Court must isolate—and not consider—the fact that Kirby was agitated and raised his voice during the interaction with Hoopes in the McDonald's parking lot. This is because the video evidence shows that Kirby did not begin raising his voice or acting agitated until after Hoopes placed him into handcuffs. "The relevant inquiry is whether the arresting officer[] had [reasonable suspicion] to arrest [Kirby] at the time of the arrest, not whether the officer['s] decision to arrest [Kirby] can be justified by information learned after the arrest." *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999). Accordingly, Kirby's post-arrest conduct is irrelevant to the reasonable suspicion analysis.

As to the remaining circumstances, there is important context missing from what Hoopes has alleged regarding the interaction in the McDonald's parking lot. For starters, Kirby approached the officers from behind because that is literally the only way he could have legally approached them in his own vehicle, given that the police vehicle was facing the outside edge of the parking lot. To approach the officers from the front, Kirby would have had to drive over the curb and sidewalk and across a strip of grass. Moreover, Kirby did not "sneak up" on the officers by approaching them in a quiet or furtive way. To the contrary, the video footage shows that he drove his vehicle to a location that was more to the side of the police vehicle than behind it, while leaving a substantial distance between himself and the officers. Kirby then announced his presence right away by calling out, "How much is his bond?" Nothing about these actions created any meaningful safety risk for the officers or otherwise has more than trivial significance to the presence of reasonable suspicion. Indeed, Loftus barely looked up from his computer when Kirby spoke and thus clearly did not view Kirby's presence as anything more than an annoyance. If this is enough to establish reasonable suspicion, officers would have the authority to detain virtually any citizen who approaches them during an investigation. This is not the law. *See Chestnut*, 947 F.3d at 1090–91 ("Our circuit in particular has been quite forthright in upholding the right of citizens to engage with officers while they perform their duties.").

Hoopes comes modestly closer to the mark when he points out that Kirby had already interacted with officers twice before approaching them in the McDonald's parking lot. In some circumstances, this might imply that Kirby was indeed attempting to obstruct their work. But, again, context matters. Kirby's first interaction with the officers simply involved him calling across the street to tell them he had paid for the chips Dibble appeared to have stolen. Because this statement was both true and relevant to the investigation, it is difficult to see how it could amount

to interference with official acts. At most, it might have been mildly distracting, but the Eighth Circuit has squarely recognized that "distraction alone does not amount to obstruction [of the performance of official duties]." *Hunt*, 109 F.4th at 1009.

Similarly, the second time Kirby interacted with officers, it was because *Loftus* approached *him* to ask questions about what else Kirby paid for. Answering an officer's questions is not interference with official acts under even the broadest reading of the law. In fact, even if Kirby had gone further by, for example, "shouting criticisms at the officer," it would not have justified his arrest. *See Hoyland v. McMenomy*, 869 F.3d 644, 654–55 (8th Cir. 2017). This is because "[t]he terms 'resist' and 'obstruct,' as used in [Iowa Code § 719.1], do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." Iowa Code § 719.1(3). Kirby's actions prior to the McDonald's parking lot come nowhere close to constituting interference with official acts.

This brings the analysis back to what happened in the McDonald's parking lot. As noted above, Kirby did not approach the officers in a threatening or suspicious way at that location, instead openly making his presence known from a reasonable distance that would not have been intimidating to a reasonable officer. *See Chestnut*, 947 F3d at 1089 (denying qualified immunity where plaintiff "remained visible and in the open" while he interacted with officers). From there, the first thing Kirby said was, "How much is his bond?" This question is inherently *non*-obstructive because it presumes the officers intended to arrest Dibble and acknowledges their authority to do so. Kirby was simply trying to figure out what he needed to do next to secure Dibble's release. It is difficult to imagine a scenario where a concerned citizen will have "interfered with official acts" by virtue of asking how to bond someone out of jail. Thus, the very nature of Kirby's question undermines the presence of arguable reasonable suspicion.

The next sequence of events is not much better for Hoopes in terms of establishing arguable reasonable suspicion. When Loftus told Kirby to "Go away," Kirby responded by saying, "I don't gotta go nowhere." Although this statement was at least modestly defiant, Kirby made it while in a public parking lot a reasonable distance away from the officers. Thus, Hoopes knew or should have known that Kirby's statement was legally correct. *See State v. Lewis*, 675 N.W.2d 516, 526 (Iowa 2004) ("These individuals were free to go about their business on [the] property without police interference."); *State v. Smithson*, 594 N.W.2d 1, (Iowa 1999) (holding that merely failing to cooperate with the police or objecting to their orders does not constitute interference with

official acts under § 719.1); *see also Hoyland*, 869 F.3d at 654 (denying qualified immunity because plaintiff's refusal to go back inside his residence when directed by officers to do so did not constitute obstruction). Moreover, Kirby did not do anything that could be considered threatening when he made the statement. Thus, even if the statement "I don't gotta go nowhere" is considered a form of verbal harassment, it falls squarely within the scope of Iowa Code § 719.1(3)'s recognition that verbal harassment is not interference with official acts unless "accompanied by a present ability and apparent intention to execute a verbal threat physically." *See McCrystal*, 708 F.3d at 1004 (denying qualified immunity where, at most, plaintiff simply directed an obscenity toward officers while walking away from them); *see also Hunt*, 109 F.4th at 1006–1009 (denying qualified immunity for officer who arrested plaintiff for obstruction after plaintiff talked back and refused to stay put).

Moreover, even if Hoopes reasonably could claim that he and Loftus needed Kirby to move further away to facilitate the completion of their work—a dubious proposition, in context—it is clearly established under Iowa law that "a single instance of mere failure to cooperate cannot serve as the basis for a charge of interference with official acts." *Irvin v. Richardson*, 20 F.4th 1199, 1208 (8th Cir. 2021) (quoting *State v. Sullivan*, No. 08-0541, 2009 WL 250287, at *4 (Iowa App. Feb. 4, 2009)). This conclusion emanates from the Iowa Supreme Court's decision in *State v. Lewis*, which held that "[t]he mere act of quickly walking away from the officer and ignoring his directions to stop . . . is not interference with official acts." 657 N.W.2d at 526; *compare, e.g.*, *State v. Parsons*, No. 09-1438, 2010 WL 2757189, at *4 (Iowa App. July 14, 2010) (affirming conviction for interference with official acts where defendant disobeyed officers' commands to back up three times as they tried to investigate "hectic" scene involving "a weapon, shots fired, and a large fight). Here, Kirby's "non-cooperation" simply involved him making a legally accurate statement about his right to be in a public parking lot. The Eighth Circuit has recognized that conduct more egregious than this does not amount to interference with official acts under Iowa law. *See Dunn v. Does 1–22*, 116 F.4th 737, 750 (8th Cir. 2024) ("[W]alking and shouting expletives at a police van does not alone provide arguable probable cause to make an arrest."); *McCrystal*, 708 F.3d at 1004 (denying qualified immunity where plaintiff shouted an obscenity while walking away from officers). The same conclusion is appropriate here.

The last thing that happened in the McDonald's parking lot prior to the arrest was Kirby stepping out of his car while Hoopes approached it. Again, however, Kirby did not move in a

threatening manner. To the contrary, based on the orientation of his vehicle in comparison to the police vehicle, Kirby was actually moving *away* from Hoopes as he exited his vehicle. *See Hunt*, 109 F.4th at 1006, 1009 (denying qualified immunity where plaintiff was walking away from the officer); *McCrystal*, 708 F.3d at 1004–1005 (similar). In the process of getting out of his car, Kirby did not do anything that could have been perceived as threatening; in fact, because Hoopes was already taking out his handcuffs as he approached, it appears that Kirby was trying to make it easier for Hoopes to place him under arrest. This is the opposite of interference with official acts.

In sum, nothing that happened prior to or during the Hoopes/Kirby interaction in the McDonald's parking lot gave Hoopes arguable reasonable suspicion to detain Kirby. Instead, in essence, the video shows that Kirby was arrested for being annoying or distracting. Under clearly established law, this is not a crime. *See Hunt*, 109 F.4th at 1009; *McCrystal*, 708 F.3d at 1004.

One final issue remains. Defendants argue that Kirby engaged in "other unlawful activity" during the early stages of the encounter when he jaywalked across University Avenue and briefly stood on the median to tell the officers that he had paid for Dibble's chips. (ECF 12-1, pp. 7–8.) Hoopes does not, however, appear to have been aware of the jaywalking, as the relevant portion of Defendants' brief attributes this idea to Loftus alone. (Id., p. 7.) Nor does Hoopes argue that Kirby's actions on the street can serve as a standalone basis to justify placing him into handcuffs, instead simply asserting that "they are part of the totality of the circumstances taken into account to determine if there is sufficient cause to detain Mr. Kirby." (Id., p. 8.) Hoopes also does not establish the requisite underlying facts for an argument about these alleged municipal violations such as showing the width of the median or speed limit on that portion of University Avenue. *See* City of Des Moines Code of Ordinances § 114-328.01 (stating that use of the median is a municipal violation only if the median is narrower than six feet); *id.* § 114-328 (stating that jaywalking is a municipal violation only if the street has a speed limit of thirty miles per hour or higher). Where, for reasons explained above, nothing else that Kirby did came close to restricting or obstructing the performance of the officers' official duties, the fact that he might have jaywalked (unbeknownst to Hoopes) or stood on a median nearly ten minutes before his arrest does not mean Hoopes had arguable reasonable suspicion to detain him for interference with official acts

4. <u>The City of Des Moines Is Entitled to Summary Judgment on Kirby's § 1983 Claim.</u>

Count V of Kirby's Petition at Law and Jury Demand asserts a claim for *respondeat superior* against the City of Des Moines "for the aforementioned conduct and/or omissions of

Officers Hoopes and Loftus." (ECF 1-1, p. 16, ¶ 72.) It is unclear whether Kirby is using Count V to try to hold the City liable on his § 1983 claims, or just his state law claims. If it is the former, his position fails as a matter of law.

"[N]either municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior." *Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018). Instead, "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Here, Kirby has made no attempt to establish a custom or policy of unlawful arrests, nor has he asserted or argued deliberate indifference. The City of Des Moines is therefore entitled to summary judgment on his § 1983 claim.

5. Summary.

For reasons set forth above, the Court GRANTS summary judgment in favor of Loftus and the City of Des Moines on Kirby's § 1983 claim but DENIES summary judgment as to Hoopes.

*C. Loftus Is Entitled to Summary Judgment on Kirby's State Law False Arrest Claim, But Hoopes and the City of Des Moines Are Not.*

To prove a claim for false arrest under Iowa law, Kirby must show: (1) he was detained or restrained against his will; and (2) the detention or restraint was unlawful. *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002). Because he was arrested without a warrant, "the burden of proof shifts to the defendant to show justification for the arrest." *Children v. Burton*, 331 N.W.2d 673, 679 (Iowa 1983). Iowa Code § 804.7 permits warrantless arrests in several scenarios, two of which are relevant here: (1) "Where a public offense has in fact been committed, and the peace officer has reasonable ground for believing that the person to be arrested has committed it"; and (2) "Where the peace officer has reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person to be arrested has committed it." Iowa Code §§ 804.7(1)(b)–(c).

"Reasonable ground" as used in section 804.7 is "equivalent to traditional 'probable cause.'" *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984) (quoting *Children* 331 N.W.2d at 678). However, "[t]he statutory standard for warrantless arrests under Iowa law is not identical to the federal constitutional standard." *Veatch v. City of Waverly*, 858 N.W.2d 1, 7–8 (Iowa 2015). An arrest that satisfies the Fourth Amendment "will not automatically satisfy the statutory

requirements for warrantless arrests under section 804.7." *Id.* at 8. Conversely, Iowa courts apply a "less demanding" probable cause standard to civil false arrest claims than to those raised in connection with a criminal prosecution: "[i]f the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Children*, 331 N.W.2d at 680; *see also Veatch*, 858 N.W.2d at 7 (same). In other words, courts must give an officer greater latitude when the officer is defending civil claims for false arrest than when the challenge to the officer's conduct arises in the context of a criminal case against the arrestee.

Here, no reasonable juror could conclude that Loftus detained or restrained Kirby against his will in a situation where: (a) Hoopes was the one who chose to exit the police vehicle and place Kirby into handcuffs, and (b) Loftus exited the police vehicle a short time later and secured Kirby's release within ninety seconds. Accordingly, the Court GRANTS summary judgment in Loftus's favor as to Kirby's state law false arrest claim. Because the Court concluded above that the § 1983 and "trespass to the person" claims against Loftus are also not viable, Loftus will be dismissed from the case.

The Court DENIES summary judgment as to Hoopes on the state law false arrest claim. Hoopes makes the same arguments on the false arrest claim that he made on the § 1983 claim. For reasons explained above, these arguments are insufficient to establish a lawful basis for the arrest under the Fourth Amendment or state law. *See Galanakis v. City of Newton*, 4:23-cv-00044, 2024 WL 606235, at *15 (S.D. Iowa Feb. 8, 2024) (denying motion for summary judgment on state law false arrest claims for the same reasons that summary judgment was denied on § 1983 claims).

The Court also DENIES summary judgment on the state law false arrest claim against the City of Des Moines. Defendants argue, in conclusory fashion, that Kirby "failed to plead an action [against the City] under Iowa Code [Chapter] 670 and for that reason, this claim should be summarily dismissed." (ECF 12-1, p. 17.) But Iowa Code § 670.4(3) states that "[t]his section does not expand any existing cause of action or create any new cause of action against a municipality." In other words, it is a "non-rights-creating statute." *Close v. City of Bellevue*, 179 F.4th 1109, 1117 (8th Cir. 2026). It is therefore difficult to understand what Defendants are trying to argue, particularly given their failure to cite any authority beyond Chapter 670 itself. In the face of "perfunctory briefing and an underdeveloped record," the Court will not grant summary judgment

in the City's favor on the false arrest claim. *See Dunn*, 116 F.4th at 751 (internal punctuation omitted).

## IV. CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment. (ECF 12.) All claims against Defendant Loftus are dismissed, along with the trespass to the person claims against all three Defendants and the § 1983 claim against the City of Des Moines. The remaining claims (for false arrest and under § 1983 against Defendant Hoopes and false arrest/respondeat superior against the City of Des Moines) will proceed to trial.

**IT IS SO ORDERED.**

Dated this 27th day of October, 2026.

__________________________________
Stephen H. Locher
UNITED STATES DISTRICT JUDGE